IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

EARL AND MONICA PURSELL,           )
                                   )
          Plaintiffs,              )
                                   )
vs.                                )     Case No. 3:20-CV-01188-MAB
                                   )
HYDROCHEM LLC, ET AL.,             )
                                   )
          Defendants.              )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Presently before the Court is Miller Environmental's motion for summary judgment (Doc. 132). For the reasons outlined below, the motion will be denied.

### PROCEDURAL BACKGROUND

This case was first filed on September 11, 2020 in the Third Judicial Circuit Court in Madison County, Illinois. Plaintiffs Earl Pursell, III, and Monica Pursell seek to recover money damages for personal injuries and consortium injuries after Mr. Pursell sustained injuries from an incident that occurred on September 15, 2018 at the Wood River Refinery in Madison County, Illinois. This case was then removed to the Southern District of Illinois by Hydrochem, LLC ("Hydrochem") on November 5, 2020 pursuant to diversity jurisdiction (Doc. 1). *See* 28 U.S.C. §1332; 28 U.S.C. §1446.

Third-Party Plaintiff Hydrochem, LLC then filed a third party complaint against Miller Environmental ("Miller") on May 14, 2021 (Doc. 31). In this complaint, Hydrochem details that Miller was hired by the landowner, Phillips 66, to decontaminate, clean,

hydro-clean, remove gases, and otherwise make safe the vessel/quench column V-18107 in anticipation of boilermakers for Miller Industrial Service Team, Inc., ("MIST") to enter the vessel to vacuum Raschig rings (Doc. 31, p. 2). According to Hydrochem, Miller negligently and carelessly failed to properly inspect V-18107 to identify potentially combustible dusts, vapors, gases, and other hazardous materials; negligently and carelessly failed to properly decontaminate the vessel; and negligently and carelessly failed to properly inspect the vessel (*Id.* at pp. 2-3). Hydrochem outlines that on September 15, 2018, because of Miller's negligent and careless actions, Mr. Pursell suffered injuries due to a fire and explosion (*Id.* at p. 4).

After engaging in discovery, Miller filed its motion and supporting memorandum for summary judgment on June 17, 2022 (Docs. 131 132). The same day, Miller also filed a motion to exclude Hydrochem's expert's testimony (Doc. 133). On July 18, 2022, Hydrochem filed separate responses to the motion for summary judgment and the motion to exclude (Docs. 139, 138). Miller filed a reply brief on August 1, 2022 (Doc. 147).

## FACTUAL BACKGROUND

I.    Miller's Proposal

On or about March 22, 2018, Miller submitted a proposal to decontaminate V-18107 (Doc. 139-1). In the "Detailed Cleaning Method" portion of the proposal, Miller stated that it would "inject Clean Sweep 2000X into the liquid circulation and supplied steam headers" after the system is heated "for approximately 8-12 hours in each system" (*Id.* at p. 10). The method, as described by Miller, goes on to state that "each system will be steam rinsed for 1-2 hours prior to moving onto the next step in the decontamination

process" (*Id.*). Further, the proposal contained a Responsibility Table, which demonstrated whether Miller, Phillips 66, or both would be responsible for performance of certain activities (*Id.* at pp. 11-12). Among Miller's sole and joint responsibilities were "Vacuum Truck," "Use of equipment to maximize the cleaning effectiveness," "Monitoring and testing of cleaning solution," "Temperature of cleaning solution," "Temporary Circulation Equipment," "Hydrocarbon Test," and "Analytical Testing." *Id.* The scope of work, specifically as to V-18107, included a liquid wash and vapor phase (*Id.* at p. 8).

II.     Miller's Procedure to Decontaminate V-18107

Miller developed a procedure to decontaminate V-18107 (Doc. 139-4). The procedure outlines that the Clean Sweep™ 2000X "will neutralize iron sulfides and oxidize residual hydrocarbons and pyrophoric material through a hybrid decontamination process" (*Id.* at p. 2). Once injected into the liquid solution, Clean Sweep™ 2000X continues "at a steady rate until the system is deemed hydrocarbon and pyrophoric free," and circulates liquid in the bottoms of V-18107 "to remove any hydrocarbon and pyrophoric material in the system" (*Id.* at pp. 2-3). The procedure further indicates that Miller "monitor[s] the waste from the bottom of the vessel to verify the presence of cleaning solution" and that Miller has the option of either verifying through "visual testing" or through "analytical testing" at the drain header (*Id.* at p. 6).

Additionally, each procedural step in the cleaning process was required to be signed off on before the next procedural step could occur (Doc. 139-3, p. 17). However,

no records of signing off exist because they were destroyed in a hurricane, and digital copies were not retained. *See* Doc. 139-3, pp. 6-12.

III.   Deposition Testimony Regarding Miller's Decontamination Process

Joseph Melton was Miller's project and site manager for the turnaround project at Wood River (Doc. 132-1, p. 7). Miller's role in the turnaround was to assist Phillips 66 in removing Hydrogen Sulfide from the system so that Phillips 66 could open various vessels for maintenance. *Id.* Mr. Melton testified that on most turnarounds, Miller is not present on the site while hydro blasting, vacuuming, or similar activities are performed (*Id.* at p. 9). Mr. Melton further testified as to the process by which Miller executed this turnaround project. The turnaround project consisted of decontaminating (also called "deconning") gases within a vessel at Wood River using steam, water, and "chemistry" (*Id.* at p. 15). Decontamination is different from chemical cleaning because chemical cleaning uses acid and is caustic, while decontamination uses gases and vapor space. *Id.*

Generally, there are two ways to remove iron sulfides. This is done either "through a chemical process with the iron scale through an acid wash and add some surfactant in with it to remove some of it" or by "removing the H2S, which is the hydrogen sulfide, which is a sulfur component in the iron [sulfides] […] because by taking one part of the molecule out, you've eliminated" the iron sulfides (Doc. 139-2, pp. 5-6).   For the Wood River project, Mr. Melton explained that Miller used a liquid wash/vapor to de-gas the V-18107 quench column at issue by injecting a propriety compound called Clean Sweep™2000X into the column (Doc. 132-1, p. 16). Miller was hired to remove the

hydrogen sulfide from the system through the use of Clean Sweep 2000X in order for the system to be opened up and repaired (Doc. 139-2, pp. 5-6).

Mr. Melton explained that Clean Sweep™ 2000X is "20% sodium permanganate," which is similar to the solutions used by other companies that perform this type of work (Doc. 132-1, p. 16). Generally how this type of work occurs is that Miller fills the system (V-18107, in this case) with water and then circulates that water using Phillips 66's pumps (*Id.* at p. 18). Miller then injects the chemical solution into the bottom of the system while the vessel is heating up. *Id.* Mr. Melton explained that the airspace above the waterline ("vapor space") is then used to clean the overhead accumulator drum. *Id.* Mr. Melton testified that Phillips 66 monitors this phase of the process to make sure it is flowing correctly using a control board. *Id.*

Clean Sweep™ 2000X is purple in color and will change in color, which will trigger different protocols. For example, if the solution is not purple, Mr. Melton explained that there is a "dirty system with a lot of hydro carbonate and oxidation is available" (*Id.* at p. 18). When this happens, Miller continues to pump Clean Sweep™ 2000X into the system until the solution turns purple again or there is an "oxidation percentage." *Id.* Essentially, this means the solution is still reacting with some of the sulfur content or some of the hydrogen until it turns purple or there is an oxidation percentage. Ultimately, Mr. Melton explained that "you can't finish the process" until the solution is purple or there is an oxidation percentage. *Id.* Before moving onto the next step in the process, Miller provides Phillips 66 with a final sample (*Id.* at pp. 18-19). Phillips 66 also performs gas checks on the overhead of the vessel to ensure hydrogen sulfide is removed from the airspace. *Id.*

During the de-gassing process, the hydrogen sulfide does not disappear; rather it is "removed as neutralized and removed as a hazard" (*Id.* at p. 40). Similarly, Mr. Melton explained that sulfur is neutralized, bonded with the oxidation and neutralized, and then removed from a dangerous form. *Id.* The sulfur does not disappear. *Id.* Prior to working at Miller, Mr. Melton worked for PSC and he testified that the degassing process he used at PSC is identical to the process Miller used at Wood River in September 2018 (*Id.* at p. 42).

Miller analyzed the results of the cleaning process employed to "make sure the [hydrogen sulfide] is removed" (Doc. 139-2, p. 10). Melton further testified that he would not expect hydrogen sulfide or sulfur dioxide to still be present in the column after the cleaning process and that "operations verifies it and says that the [hydrogen sulfide] and everything is removed, everything is good" (*Id.* at p. 11).

Ron Weisar worked for Phillips 66 for nearly 25 years and during that time worked on various turnaround projects at Wood River (Doc. 132-2, p. 24). Mr. Weisar testified that his role in turnaround projects focused on detailing the work scope for a particular piece of equipment or vessel, as well as determining what equipment needed repairs and how to repair the equipment. *Id.* He also acted as a coordinator and planner for the turnaround, and is familiar with the V-18107 vessel. *Id.* Mr. Weisar testified that hydro blasting involves using water at high pressure to blast away material and "help clean up a piece of equipment or structure so that Phillips 66 can properly inspect it and perform any necessary repair." *Id.* One of the objectives of hydro blasting is to remove sulfates, which in "a wet form are like mud and in dry form are like dust." *Id.* The removal of mud,

solids, or dusts containing sulfates occurs after a vessel, like V-18107, is degassed (*Id.* at p. 25). Based on his experience, Weisar expects sulfates would be present inside a vessel after the de-gassing and before hydro blasting takes place. *Id.*

Once a vessel, such as or similar to the V-18107, is tested and monitored, it is opened to atmosphere (*Id.* at p. 26). After the vessel is opened, Phillips 66 uses air blowers to move air through the tower to ensure a safe entry atmosphere within the tower. *Id.* While air is being pumped into the vessel, Phillips 66 monitors the atmosphere inside the vessel to ensure the process is progressing and to determine when the vessel will be ready for entry (*Id.* at p. 27). Phillips 66 keeps a constant eye on the vessel to check for any smoke or fumes and "starts keeping it wet." *Id.* Per Mr. Weisar, it was Phillips 66's expectation that while some sulfates would be removed during the chemical cleaning process, others would remain (*Id.* at p. 31).

Brett Haynes has worked at Miller as an MSS-SMC/Chemical Manager since May 2020 (Doc. 132-3, p. 1). Before joining Miller, Haynes worked for Hydrochem. *Id.* Haynes is familiar with the de-gassing procedures used on vessels such as V-18107, and is familiar with the processes Hydrochem used in 2018. *Id.*

With respect to the September 2018 turnaround at Wood River, Mr. Haynes submitted an affidavit detailing that Miller's scope of work was to degas the process equipment of any volatile organic compounds, hydrogen sulfide, and light oils to allow for maintenance and a final cleaning (*Id.* at p. 2). De-gassing, or decontamination, does not mean a total cleaning of all scale and sludges, including scales and sludges that contain sulfates. *Id.* Degassing likewise does not remove scale, sludges, and dusts from

packing material, including Raschig rings. *Id.* Degassing, however, does remove contamination that would prohibit the plan from conducting additional mechanical cleaning methods was needed, including hydro blasting or vacuuming. *Id.*

Hydrochem's teaching methods and instruction regarding degassing of columns such as or similar to V-18107 recognize that degassing is not designed or intended to remove sludges, dusts, or solids, but instead removes bad atmospheric gases such as hydrogen sulfide and volatile organic compounds (*Id.* at p. 3). Further, within Hydrochem's Chemical Services Division, it was known and understood that the degassing process is not intended or designed to remove sulfur containing solids, materials of this type were to be removed via hydro blasting (*Id.* at p. 4). Hydrochem's degassing process, like Miller's, is designed and intended to remove Hydrogen Sulfide and volatile organic gasses so that the structure or equipment can be opened, entered, and cleaned and a subsequent cleaning process, such as hydro blasting would be used to remove solids, including dusts and sludges which contain sulfur (*Id.* at pp. 3-4). Like Miller's process, Hydrochem's degassing process is designed to make a vessel or other similar equipment "clear for entry" (*Id.* at p. 3).

In September of 2018, Hydrochem employed Jeff Reese as its integration manager and his duties included integrating PSC's operations into Hydrochem's (Doc. 132-4, p. 5). Reese also acted as Hydrochem's overall manager for the Wood River turnaround (*Id.* at p. 6). As overall manager, Reese coordinated Hydrochem's activities which he describes as "multiple industrial cleaning activities across multiple operating units that was [sic] bound for the turnaround" (*Id.* at p. 7). Reese describes the E-Train as a "sulfur unit" but

is unable to identify or provide even a general description of the E-Train unit's purpose and/or function. *Id.* Hydrochem provided a vacuum truck which was used to remove packing material from the E-Train unit. *Id.* MIST employees used a hose attached to the vacuum truck to remove the Raschig rings from the E-Train unit, including V-18107 (*Id.* at p. 8).

With respect to V-18107, Reese had no discussions or communications with anyone at Phillips 66 concerning the presence of combustible dust in the column once air mover operations were commenced. (*Id.* at p. 13). As of September 15, 2018, Reese did not believe a quench column specifically designed to remove sulfur from a petroleum product would contain residual sulfur after it was degassed. (*Id.*). Reese concedes that he "did not know the process" (*Id.* at p. 14).

IV.    September 15, 2018 Incident

The removal of the Raschig rings that Pursell and another MIST employee were doing on September 15, 2018, was done with the expectation that the quench column had been decontaminated and was free of hydrocarbons and pyrophoric, and that any iron sulfides had been neutralized (Doc. 139-5). MIST employed 57 people per shift, including Earl Pursell and Walter Ricks (*Id.* at p. 3). The V-18107 vessel Ricks and Pursell were working on at the time of the explosion/fire, has twenty to twenty-four inch diameter manway which Ricks and Pursell used to enter the vessel's interior. (Doc. 132-6).

Ron Weisar, the Phillips 66 Day Shift Turnaround Coordinator for the E-Train Sulfur Recovery Unit, testified that the expectation was that there would not be significant combustible dust encountered after the cleaning process (*Id.* at p. 1; 14). There

had never been an incident where there was any type of sulfur dust explosion from vacuuming Raschig rings and Miller did not raise the potential for such an event (Doc. 139-6, p. 5). Weisar, therefore, signed off on the Entry Permit which did not reference "fire/sparks" or "fire watch", items which would have been referenced if combustible dust were anticipated (Doc. 139-6, p. 6-8). He expected that Miller would remove most of the sulfates or the solids from the tower (*Id.* at p. 11). Nor would Weisar expect SO2 (sulfur dioxide) and H2S (hydrogen sulfide) to be at levels outside of safe limits when workers were going to be inside V-18107 (*Id.* at p. 13). Weisar admitted that an area may be determined safe to enter, but the activity may disturb "a pocket of gas." *Id.*

Ricks and Pursell used an unbonded plastic hose to vacuum the packing material, also known as Raschig rings from V-18107. (Doc. 132-5, p. 5). The packing material or Raschig rings were stacked eight foot high in the vessel and Pursell and Ricks had removed between three to four feet of the rings from the vessel before the explosion/fire occurred (*Id.* at p. 6). Ricks estimates it took three to four hours to remove the three to four feet of rings/packing material from the vessel (*Id.* at pp. 7-8). Ricks and Pursell wore Hydrogen Sulfide monitors and neither of which went off or otherwise activated prior to the explosion/fire (*Id.* at p. 19). While Ricks was inside the vessel he detected a "small hint of a sulfur smell" but that sensation did not cause him any alarm as it is not uncommon to smell or note a "small hint of sulfur" (*Id.* at pp. 18-19).

Ricks observed a fireball exit the vacuum hose and enter the vessel. He heard a sound comparable to shotgun going off, followed by a fire exiting the end of the hose. (*Id.* at p. 22). The vacuum hose, in Ricks' words, "choked down and just spit a big ball of fire

out of it." *Id.* While he was vacuuming the packing material, Earl Pursell did not detect or observe any dust accumulation in V-18107. (Doc. 132-7, p. 4). Pursell's H2S alarm buzzed and blinked following the explosion, but not before. (*Id.* at p. 2).

Back in June of 2018, Hydrochem would use bonded hoses to remove packing material from a quench column such as V-18107 when it "knew of a known combustible material" as is stated in Hydrochem's policy (Doc. 132-4, p. 14). Reese did not ask Phillips 66 to provide documentation or material concerning the chemical cleaning process that was to be performed before Hydrochem commenced its air mover operations on the E-Train unit, including V-18107 and did not request MDS sheets (*Id.* at p. 20). Reese acknowledges that elemental sulfur - assuming it's not exposed to electricity or a certain type of flame source, will not burst into flame, smolder or catch fire as it is not "self-exploding" (*Id.* at p. 28). Reese acknowledges that he knew as of September of 2018 that sulfur was a combustible dust but in planning Hydrochem's work on this turnaround did not reach out to Hydrochem's Chemical Treatment Division to discuss potential hazards associated with removing packing material from a sulfur quench tower such as V-18107 (*Id.* at 110).

Reese was familiar with Phillips 66's policies regarding safe vacuum truck operations, and acknowledges those policies apply to Hydrochem's operations at Wood River. He was also aware of Phillips 66 policies which state, "all vacuum trucks and hydro-excavation trucks must be grounded and hoses bonded at all times while loading or unloading any material including hydrocarbon or flammable/combustible materials" and "the movement of liquid or dry material through flexible hoses has the potential to

generate static sparks which is capable of igniting flammable material or vapors." (*Id.* at pp. 29-30).

V.      Phillips 66 Incident Report + After Incident reports

Per an internal incident investigation report prepared by Phillips 66, the fuel that caused the explosion, which resulted in the respiratory exposure incident suffered by Pursell, was combustible sulfur dust (Doc. 139-12). Per XRF data gathered by Phillips 66 regarding the Raschig rings gathered from V-18107 following the incident, the residual particulate covering the Raschig rings was more than 40% sulfur and more than 10% iron, the two main components of iron sulfide (Doc. 139-13). Dust with greater than 25 percent sulfur has the propensity for ignition or explosion (Doc. 139-11, p. 12).

VI.     Hydrochem's Expert Report and Findings

Hydrochem's expert, Russell Ogle, Ph.D., found that the V-18107 was packed with hydrocarbon and pyrophoric-contaminated Raschig rings (Doc. 139-15, p. 30; Doc. 139-14, pp. 2-3; Doc. 139-11, pp. 3-4). Furthermore, the Phillips 66 incident investigation observed a residue on the Raschig rings and determined that it was a combination of metal sulfides, but principally iron sulfide based on chemical analysis (Doc. 139-12). Aside from sulfur-containing residue on the Raschig rings, no other credible condensed-phase fuels were identified in Phillips 66's investigation or otherwise. "[V]arious gas monitoring devices recorded concentrations of sulfur-containing gases" (Doc. 139-15, p. 35). Low concentrations of hydrogen sulfide were also recorded (*Id.* at pp. 36-40).

## LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 570 (7th Cir. 2016). Where the moving party fails to meet that strict burden, the Court cannot enter summary judgment for that party even if the opposing party fails to present relevant evidence in response. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between

the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

## DISCUSSION

The Illinois Contribution Act provides that, "[W]here 2 or more persons are subject to liability in tort arising out of the same injury to [the plaintiff], ... there is a right of contribution among them, even though judgment has not been entered against any or all of them." *Sherwood v. City of Chicago*, No. 19 C 6605, 2020 WL 777258, at *3 (N.D. Ill. Feb. 18, 2020) (citing 740 ILL. COMP. STAT. 100/2). The present matter is a third-party action brought by Hydrochem against Miller based on negligence. "To state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1096 (Ill. 2012) (internal citations omitted).

Miller contends that Hydrochem cannot prove the essential elements of its contribution claim for negligence (duty, breach of duty, and causation) and thus summary judgment is warranted (Doc. 132, p. 10). According to Miller, Hydrochem's central theory is that Miller left behind solids in the vessel in question, which caused the explosion that resulted in Plaintiff's injuries. But according to Miller, it never had a duty to remove solids and solids containing sulfur specifically; rather, its duty was limited to degassing the vessel in question (*Id.*). In fact, Miller argues that it was Hydrochem's role

Page 14 of 23

to neutralize iron sulfide and oxide pyrophoric materials (*Id.* at p. 11).

Hydrochem argues that Miller owed a duty to make V-18107 safe for workers providing the next step in the turnaround process to bring the SRU back online by neutralizing iron sulfides and oxidize residual hydrocarbons and pyrophoric material through a hybrid decontamination process (Doc. 139, pp. 14-15, citing Doc. 139-4). Furthermore, Hydrochem argues Miller had a duty to identify ignitable material that could remain in the column and notify Phillips 66, as well as other personnel (Doc. 139, p. 15). Miller filed a reply brief, arguing that Hydrochem submitted inadmissible evidence (*e.g.*, inadmissible hearsay, lack of foundation, and speculation/conjecture) and, ultimately, Hydrochem's arguments relating to duty and breach still fail. The Court first turns to whether Miller owed a duty and, if so, the parameters of that duty.

I.    Duty

Miller argues that Hydrochem's amended complaint refers to contractual duties as the basis for its claim against Miller (Doc. 132, p. 11). But Miller takes umbrage with this position, as Hydrochem fails to "identify a contract, agreement or proposal and does not allege or otherwise identify a specific contractual provision…[to] describe the nature, extent and scope of the putative duty it would place on Miller" (Doc. 132, p. 11). But if Hydrochem is referring to Miller's proposal as the basis for liability, Miller argues that the proposal outlines that the scope of the duty was limited to degassing the vessel only, which Miller did (*Id.* at pp. 10-11). Specifically, Miller was hired to "ensure the sulfur E-Train unit equipment, including V-18107, was properly degassed with a chemical decontamination package" (Doc. 132-1).

Hydrochem argues that Miller had a duty to remove or neutralize pyrophoric materials and iron sulfides and that had Miller succeeded in this, "there is no possibility that Pursell would have been injured" (Doc. 139, p. 16). Hydrochem also says that the record makes clear Miller had a duty to make V-18107 safe for workers before they continued the next step in the turnaround process (*Id.* at p. 14).

Whether or not a duty exists is a question of law. *Baroni v. Viox Servs., Inc.*, No. 11 C 3738, 2014 WL 3805745, at *4 (N.D. Ill. July 30, 2014) (citing *Adams v. N. Ill. Gas Co.*, 809 N.E.2d 1248, 1257 (Ill. 2004)). For negligence in Illinois, a plaintiff must establish that the "defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach." *Sears, Roebuck & Co. v. Tyco Fire Prod. LP*, 833 F. Supp. 2d 892, 906 (N.D. Ill. 2011) (citing *Johnson v. Wal–Mart Stores, Inc.*, 588 F.3d 439, 441 (7th Cir.2009) (quoting *Espinoza v. Elgin, Joliet & E. Ry. Co.*, 649 N.E.2d 1323, 1326 (Ill. 1995)). Where the negligence action is based on a contractual obligation, the scope of the duty is determined by the contract terms. *ExxonMobil Oil Corp. v. Amex Constr. Co.*, 702 F.Supp.2d 942, 970 (N.D. Ill. 2010) (citing *Melchers v. Total Elec. Constr.*, 723 N.E.2d 815, 818 (Ill. App. Ct. 1999)); *see also Dyduch v. Crystal Green Corp.*, 582 N.E.2d 302, 306 (Ill. App. Ct. 1991).

Despite Miller's criticism of this argument, and Hydrochem's failure to point to a contract detailing Miller's duty, both parties seem to argue that the Court must look to Miller's proposal to determine the scope of its duty. The parties cite to two main cases in support of their positions—*Bray* and *Pasquinelli*. In *Bray*, the Court analyzed whether a counter-defendant to the City of Chicago had a contractual duty to maintain a sidewalk

where the plaintiff fell and was injured. *Bray v. City of Chicago*, 2022 IL App (1st) 201214, ¶ 30. The court analyzed the contract and found there was some evidence from which a jury could conclude that the counter-defendant owed plaintiff a duty of care to maintain the sidewalk in a safe way, breached that duty, and the breach was the proximate cause of her injuries. *Id.* at ¶ 40.

In *Pasquinelli,* the estate of an elderly married couple sued the company they hired to take care of the couple after the couple died due to complications from carbon monoxide poisoning after the husband left his car running in the attached garage for many hours. The estate argued that the caretaking company owed the couple a "common-law duty of care due to its 'specialize knowledge in caring for elderly clients reliant on [Comfort Keepers] for their safety'." *Pasquinelli v. Sodexo, Inc.,* 193 N.E.3d 836, 845 (Ill. App. Ct. 2021). Ultimately, the court found that the caretaking company did not owe the aforementioned common-law duty of care to the couple because the couple and their caregiver had a contract for their care; therefore, the scope of duty was determined by the terms of the contract and the duties could not be expanded beyond the scope of the contract. *Id.* at 846. Both *Bray* and *Pasquinelli* demonstrate that when a contract is in play, the Court must look to the terms of the contract to analyze whether there is a duty and the parameters of that duty.

With these cases in mind, the Court first turns its attention to the language contained in Miller's proposal and procedure. The proposal outlines the work that Miller planned to do at the Wood River site. "The Clean Sweep™ 2000X is an exceptionally high performing chemistry used at a very low concentration in water/steam to internally clean

and decontaminate the refinery process equipment" (Doc. 139-1, p. 10). The Sulfur Unit E-Train Decontamination Procedure outlines that the Clean Sweep™ 2000X "will neutralize iron sulfides and oxidize residual hydrocarbons and pyrophoric material through a hybrid decontamination process" (Doc. 139-4, p. 2). The process of injecting Clean Sweep™ 2000X would continue "at a steady rate until the system is deemed hydrocarbon and pyrophoric free," as well as circulating liquid in the bottoms of V-18107 "to remove any hydrocarbon and pyrophoric material in the system" (*Id.* at pp. 2-3).The procedure further indicates that Miller would "monitor the waste from the bottom of the vessel to verify the presence of cleaning solution" and that Miller had the option of either verifying through "visual testing" or through "analytical testing" at the drain header (*Id.* at p. 6). Ultimately, Miller was hired to remove the hydrogen sulfide from the system through the use of Clean Sweep™ 2000X in order for the system to be opened up and repaired (Doc. 139-2, pp. 5-6). Before moving onto the next step in the process, Miller provided Phillips 66 with a final sample. *Id.* at pp. 18-19. Phillips 66 also performs gas checks on the overhead of the vessel to ensure hydrogen sulfide is removed from the airspace. *Id.*

Based on the documents before the Court, Miller was responsible for degassing the vessel and removing and/or neutralizing hydrocarbon and pyrophoric material as well as iron sulfides so that the next step in the decontamination process could occur. Furthermore, the proposal details that safety is "the single most important thing we do every day—it is the number one priority at Miller Environmental" (Doc. 139-1, p. 4). Hydrochem has presented more than sufficient factual basis demonstrating that Miller

had a duty to decontaminate V-18107 and make it safe per its own procedural documents, and the understandings of the parties to the agreement. As such, the Court moves onto whether Miller is entitled to summary judgment based on proximate cause.

## II.    Proximate Cause

Miller further argues that Hydrochem cannot establish that Miller's breach of its duty was the proximate cause of Plaintiff's injuries either (Doc. 132, pp. 11-12). Simply put, Miller argues that the incident, alone, is not proof that Miller proximately caused the incident. Miller argues that Hydrochem has failed to submit evidence that the circulation of Clean Sweep™ 2000X was not performed or that testing to support that decontamination was also not performed (*Id.* at p. 13). Furthermore, Miller says Hydrochem only submits inadmissible hearsay statements offered "by alleged witnesses," including Whiddon, Call, Ketcham, and Jarett. Miller contends these individuals do not have personal knowledge as to the work Miller performed (*Id.* at p. 14). Lastly, Miller argues that Hydrochem's expert, who believes "the incident and Mr. Pursell's injuries were caused by [Miller]'s failure to adequately decontaminate the column," is unqualified and his testimony and opinion are inadmissible because they do not meet the requirements of *Daubert* or Rule 702 (Doc. 132, p. 15). Miller filed a reply brief as well, in which it reiterated its argument that the only support in the record for Hydrochem's position is "inadmissible hearsay," which the Court should not consider in its analysis (Doc. 147, citing to Docs. 139-7, 139-8, 139-9, and 139-10).

As an initial matter, "a court may only consider admissible evidence in assessing a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). In

both the initial motion and the reply brief, Miller does not explain how certain depositions are inadmissible hearsay and the Court declines to make those arguments for Miller. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 860 (7th Cir. 2017) (citing *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties."))). Without a proper objection that Whiddon, Call, Ketcham, and Jarett's testimony cannot be presented in any admissible form, the Court finds this testimony to be competent summary judgment evidence creating a genuine issue of material fact for trial. *See Lewandowski v. City of Milwaukee*, 823 F. App'x 426, 428–29 (7th Cir. 2020) (noting that a district court "cannot consider inadmissible hearsay, *over proper objections*, in deciding summary judgment")[1] (emphasis added). If a jury were to credit the deposition testimony presented by Hydrochem, it could reasonably find that Hydrochem's version of the events were true.

Even if this testimony were disregarded, Miller still would not be entitled to judgment as a matter of law, as there is additional evidence in the record to support a jury finding in favor of Hydrochem. Miller argues that Hydrochem's expert cannot be considered because his report and testimony do not meet the requirements of *Daubert* and Rule 702. But this Court previously found those arguments to be unavailing in its October 21, 2022 Order (Doc. 168). "A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court

---

[1] *See also Cohn v. Wexford Health Sources, Inc.*, No. 3:19-CV-00376-NJR, 2022 WL 2802304, at *6 (S.D. Ill. July 18, 2022) (noting that the party seeking exclusion of testimony as hearsay had failed to argue that the testimony could not be presented in a form that would be admissible in evidence).

in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). Ultimately, the Court found that Mr. Ogle would be permitted to testify and that his opinions and testimony could not be excluded, as he is qualified to provide his opinions on the very technical subject matter (Doc. 168, p. 7). The Court will not reiterate its reasoning here as to why Mr. Ogle's opinion is admissible.

Now turning to proximate cause, "[t]he term 'proximate cause' [under Illinois law] encompasses two distinct requirements: cause in fact and legal cause." *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004). In determining whether a plaintiff has established cause in fact, the Court asks, "whether the injury would have occurred absent the defendant's conduct." *Id.* "The second requirement, legal cause, is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Id.* (internal citation omitted). *ExxonMobil Oil Corp.*, 702 F. Supp. at 964–65.

Miller was hired to decontaminate gases and vapors from the V-18107 vessel, which included removing and/or neutralizing iron sulfides and hydrogen sulfide (Doc. 139-2, pp. 5-6; 132-1, p. 16). Specifically, Clean Sweep™ 2000X "will neutralize iron sulfides and oxidize residual hydrocarbons and pyrophoric material through a hybrid decontamination process" (Doc. 139-4, p. 2). An internal incident investigation report prepared by Philipps 66 stated that the fuel that caused the explosion was combustible sulfur dust (Doc. 139-12). Hydrochem's expert, Russell Ogle, Ph.D., found that the V-18107 was packed with hydrocarbon and pyrophoric-contaminated Raschig rings (Doc.

139-15, p. 30; Doc. 139-14, pp. 2-3; Doc. 139-11, pp. 3-4). Furthermore, the Phillips 66 incident investigation observed a residue on the Raschig rings and determined that it was a combination of metal sulfides, but principally iron sulfide based on chemical analysis (Doc. 139-12). Miller may argue that any residue qualifies as "solids" for which they are not responsible. But Hydrochem also put forth deposition testimony that had Miller adequately decontaminated the column, it would have eliminated the presence of fuel within the column (Doc. 139-15, p. 42 ("Had all of the iron sulfide and other sulfur compounds been fully oxidized by Clean Sweep™ 2000X, no flammable sulfur compounds or sulfur-containing combustible dust would have remained. The presence of this fuel is proof that ME failed to adequately decontaminate the column"; *See also* Doc. 139-11, p. 13 (stating that one of the goals of decontamination was to eliminate iron sulfite and that per the lab analysis, iron sulfite and elemental Sulphur were both identified on the dust from the Raschig rings)). Hydrochem also put forth evidence that, per Miller's proposal and procedure, Miller was supposed to recirculate the Clean Sweep™2000X solution, but this was not completed, performed, and/or there is no record of this being performed (Doc. 139-15, p. 42). Additionally, Hydrochem's expert opined that "analytical testing to confirm that the column had been decontaminated was apparently not performed" (Doc. 139-15, p. 42). Ultimately, Mr. Ogle has opined that Mr. Pursell's injuries were caused by Miller's failure to adequately decontaminate the column (*Id.* at p. 42).

There is evidence in the record that materials Miller was hired to neutralize and/or remove certain materials from the vessel and these materials were still present after the

incident. Miller argues that these solid substances were not part of their work to decontaminate the vessel, but ultimately, this argument, and the evidence supporting it, are not for this Court to weigh at this time. Hydrochem and Miller offer two very different stories as to what exactly happened to cause the explosion that injured Mr. Pursell. Simply put, this dispute cannot be resolved at the summary judgment stage and the motion for summary judgment will be denied.

**CONCLUSION**

For the aforementioned reasons, Miller's motion for summary judgment (Doc. 131) is **DENIED.** This matter remains set for an in-person status conference on November 30, 2022 at 10:30 a.m.

**IT IS SO ORDERED.**

**DATED: November 21, 2022**

**/s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**